# Clark *v.* Neshannock Stone Company, Appellant.

*Negligence—Quarry company—Injuries to dam—Evidence—Case for jury.*

1. In an action against a quarry company to recover damages for injuries to a dam caused by the deposit therein of large quantities of stone, earth and other material, where the evidence of the plaintiff and one of his witnesses, although contradicted by the defendant, tends to show

that the defendant operated the only quarry above the dam, that the dam was filled with earth, stone and other materials two to three feet deep over extensive areas, the dimensions of which were approximately stated, and the amount of cubic yards of deposit approximately estimated, and the plaintiff's contention is corroborated by evidence as to the location of the quarries and the refuse dumps, with reference to the banks of the stream, the slope of the banks, and the manner of carrying on the quarry.

2. In such a case the plaintiff's right to recover nominal damages, at least, upon the facts testified to by him and his witnesses, is an insuperable obstacle to a binding direction to the defendant, and consequently to the entry of judgment for defendant non obstante veredicto.

Argued May 13, 1909.    Appeal, No. 185, April T., 1909, by defendant, from judgment of C. P. Lawrence Co., June T., 1904, No. 95, on verdict for plaintiff in case of William A. Clark v. Neshannock Stone Company.    Before RICE, P. J., PORTER, HENDERSON, MORRISON, ORLADY, HEAD and BEAVER, JJ.    Affirmed.

Trespass to recover damages for injuries to a dam.    Before W. E. PORTER, P. J.

The facts are stated in the opinion of the Superior Court.

Verdict and judgment for plaintiff for $500.    Defendant appealed.

*Errors assigned* were in refusing binding instructions for defendant and in overruling judgment for defendant non obstante veredicto.

*H. K. Gregory*, with him *T. W. Dickey*, for appellant.

*J. Norman Martin* and *A. Martin Graham*, for appellee.

OPINION BY RICE, P. J., October 11, 1909:

The plaintiff owned land and a dam on Neshannock creek, and the defendant owned and operated stone quarries along the creek above him.    The plaintiff alleged that the defendant dumped in the stream the débris and refuse produced in its quarrying operations, consisting of large quantities of earth,

stone, spawls, trunks of trees, logs, brush and other materials, which, being carried down the stream, lodged in his dam, and materially lessened its storage capacity, in which its value chiefly consisted. The learned trial judge instructed the jury that the defendant could not be held responsible for any deposit in the dam other than those coming from its own quarries; that if it deposited the refuse from its quarries on its own land, where it would not be washed away by ordinary floods, but where it was washed away by extraordinary floods and deposited in plaintiff's dam, it was not liable for the injury sustained; and that it was incumbent on the plaintiff to show how much of the deposit in the dam was caused by the defendant. The defendant has no just cause to complain, and does not complain, of these instructions. The matters it assigns for error are that the court refused its point for binding direction and overruled its motion for judgment non obstante veredicto, and this complaint is based on the single contention thus expressed in its twelfth point: "There being no testimony in this case to show how much of the deposit in this mill dam was caused by the defendant company, your verdict must be for the defendant." The plaintiff testified that he was on the dam very frequently, and that he never saw or knew of any deposits of sediment, trees, earth or other material in the dam before the opening of the quarries, and that after the defendant took possession logs, stumps, stones, gravel and earth were thrown over the bank. Being asked what change took place in the condition of his dam after the defendant took charge of the quarries, he testified as follows: "A. It was being filled up; the sediment was being thrown in; it was filling it up until it broke. Q. How much of the dam was filled up? A. There was a large body of gravel and chippings at the upper end of my dam adjoining the stone quarry property, I should say 100 feet square and at least two feet deep, a deposit, and then there was a very large deposit at the mouth or near the breast of the dam; there was a deposit there for 300 feet from the breast of the dam, at least three feet deep all over that 160 feet wide, at the lower end it wasn't so wide above it; it appeared above, it was perhaps 120 feet at the upper end and 160 feet

at the lower end—the 160 or 170 at the lower end includes the breast of the dam and my head race." He testified further that in June or July, 1902, he notified the defendant to cease throwing materials into the dam and to remove what had already been deposited; that at that time the defendant had thrown gravel, chippings, earth, stumps and trees over the bank, and the flood washed them down into the dam; and that the defendant continued this for some time after the notice was given. He further testified that at the time Mr. McConahy, whose testimony we are about to refer to, made his survey, which was a few days before the trial, a considerable part of the sediment had been washed out by the floods, and that there was only about one-half as much in the dam then as there was at the time the suit was brought. After Mr. McConahy had testified preliminarily as to his experience as a civil engineer, his survey and his plot, he was interrogated and answered as follows: "Q. State if you made any calculation of the quantity of débris and material in the dam; the part you have indicated on that map? A. Yes; you mean the whole thing? Q. Yes. A. Yes, sir. Q. What is the quantity you estimate? A. Thirty-five hundred yards. Q. Over what area does that extend? A. Well, about 400 feet along and over 160 feet wide at the dam—about 100 feet wide and 400 feet long. Q. You estimate that there are 3,500 cubic yards of material in the dam? A. Yes. Q. From your experience as an engineer in making estimates for excavation, what would it cost to remove that material? A. I should say at least $1.00 a yard." In connection with the foregoing we quote the following from his cross-examination: "Q. You aren't able to say how much of this came from the quarries above? A. No, sir. Q. And it is all mixed with matter that came down from the fields, possibly some from the quarries, isn't that a fact? A. Well, I would say the material that I saw there along the edge of where it is washed out, the edge of the channel now, seems to be of material that would come from the quarry principally. Q. How thick was that vein or deposit? A. Oh, it ran sometimes six inches thick. Q. But the whole mass was about two and one-half, wasn't it? A. Yes, sir." It is also to

be noticed that there were no other quarries upon the stream above the plaintiff and that there is no evidence of similar operations being carried on by others while the defendant was operating its quarries. Further, the evidence as to the location of the quarries and the refuse dumps with reference to the banks of the stream, the slope of the banks and the manner of carrying on the operation lends corroboration to the plaintiff's contention that the principal part of the deposit in his dam came from the quarries. As is said in the opinion of our Brother HENDERSON in Pierce v. Lehigh Valley Coal Co., 40 Pa. Superior Ct. 566, "It was the duty of the plaintiff to introduce evidence to show to what extent the injury complained of was the consequence of the defendant's action, but it cannot be expected that this can be done with mathematical exactness. Evidence which reasonably tends to support the plaintiff's allegation is sufficient." Perhaps the evidence would not justify a finding that the entire 3,500 yards of deposit, testified to by Mr. McConahy came from the defendant's quarries, but surely, if the jury believed the plaintiff and his witnesses, a finding that one-third or one-half, for example, came from him, would be within bounds. It may be said that we have presented a one-sided view of the testimony, selecting that which is favorable to the plaintiff and omitting reference to that adduced by the defendant. This would be a just criticism, if it were our province, and we were undertaking to determine the questions of fact. But this is not our province, and all that we have undertaken to do is to show that there was evidence, which, if believed by the jury, would justify a verdict in favor of the plaintiff for a substantial sum. Besides that, the plaintiff's right to recover nominal damages, at least, upon the facts testified to by him and his witnesses, was an insuperable obstacle to a binding direction for the defendant, and consequently, to the entry of judgment in its favor non obstante veredicto.

Judgment affirmed.